IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 JUN 15 AM 10: 19

U.S. DISTRICT COURT
N.D OF ALABAMA

|  |  |  |
|---|---|---|
| DONNA DUNLAP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. CV-03-PT-3381-M |
| | ) | |
| | ) | |
| STATE OF ALABAMA, DISTRICT | ) | |
| ATTORNEY OFFICE OF MARSHALL | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

JUN 15 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant State of Alabama, District Attorney Office

of Marshall County's ("the DA's Office") Motion for Summary Judgment, filed on April 28, 2004.

### FACTS[1]

Plaintiff Donna Dunlap ("Dunlap") is an at-will employee of the District Attorney for

Marshall County (" the DA").  Pursuant to statute, defendant asserts, the DA has the sole discretion

to hire and fire personnel employed in the DA's office.  *See* Ala. Code § 12-17-220(a) (1995) ("The

district attorney of each judicial circuit is hereby authorized to employ, in any manner as he or she

shall determine necessary, assistant district attorneys, investigators, clerical, secretarial, and other

personnel, who shall be paid from funds available for that purpose.") Each employee of the DA's

office is an at-will employee whose employment the DA may terminate at any time for any lawful

---

[1] To the extent facts provided by one party are not addressed by the other party, this court considers those
facts to be undisputed. This court notes where the facts appear disputed.

reason.  *Id.*  ("[A]11 of these employees serve at the pleasure of the district attorney....")

Furthermore, DA employees are not part of the State Merit System or any other merit system.  *Id.*

("[A]11 of these employees ... shall not be considered employees under the State Merit System Act.")

Plaintiff has been employed with the DA's Office since June 1995.  Dunlap's first position

was in the Worthless Check Unit ("WCU").  She is employed currently as the Restitution and

Recovery Unit Coordinator ("RRUC").[2]  Plaintiff's current supervisor is Chief Investigator Keith

Marbut, who reports directly to the DA.[3]

To assist the DA in the execution of his duties to collect court-ordered restitution as

prescribed by Ala. Code §§ 12-17-225.2 & 225.3 (1995), defendant argues, Dunlap is authorized to

negotiate payment plans with offenders and/or their attorneys on behalf of the DA for court-ordered

restitution and costs.  According to defendant, Dunlap regularly comes into contact with the public,

as she collects restitution payments from offenders and attends courtroom proceedings.[4]  The RRUC

assists in the enforcement of unpaid payments through such methods as garnishments and income

withholding orders and also responds to inquiries from victims about court-ordered restitution.

Plaintiff's name has appeared in several newspaper articles about her work with the RRU.  *See* Def.

Ex. C.  According to DA Marshall's affidavit, the DA is ultimately responsible for the RRU and the

---

[2] Pursuant to Ala. Code § 12-17-225.1 (1995), the RRU was created by the DA's office in August 1996 to provide for the administration, collection, and enforcement of court-ordered restitution in civil or criminal proceedings.

[3] Dunlap's response also alleges that Faye Upton, Office Manager, serves as her supervisor.  However, this court notes, Dunlap's deposition does not appear to support that allegation.  Furthermore, the cited pages of DA Steven T. Marshall's ("Marshall") deposition depict Faye Upton as supervisor of the felony unit, not the plaintiff's unit.

According to plaintiff, her previous supervisors were John Young and Bill Strickland.

[4] However, plaintiff insists, she does not represent the DA in the eyes of the public.  *See* discussion *infra.*

services it provides.

Marshall was appointed to[5] and still serves as DA for Marshall County. Ronald P. Thompson ("Thompson"), Marshall's predecessor, retired on July 31, 2001.    The DA's duties and responsibilities are statutorily-prescribed by Ala. Code § 12-17-184 (1995). Additional duties regarding the RRU and the WCU appear in Ala. Code §§ 12-17-225[6] and 12-17-224. The DA is also responsible for ensuring that the DA's Office adheres to the Crime Victim's Bill, §§ 15-23-60, et seq. According to Marshall's affidavit, the DA relies on the confidence and trust of certain staff members to assist him in the execution of his duties and in the administration of assistance to the public.[7]

Assistant District Attorneys ("ADAs") assist the DA in the prosecution of criminal actions in Marshall County.[8] This requirement means that the ADAs prepare cases, appear in court to try cases, and attend hearings on behalf of the DA's Office.  ADAs negotiate plea agreements with defendants and/or defense attorneys, meet with victims and their families about their offenders, and answer inquiries from the public regarding alleged criminal offenses.

The DA also employs Investigators, who are sworn officers who carry a badge that identifies

---

[5]  Marshall's appointment was effective August 1, 2001.

[6]  Section 225 reads:

> It is the purpose of this legislation to ensure that court-ordered restitution to crime victims, victim compensation assessments, bail bond forfeitures, court costs required by law, fines levied against criminals for wrongful conduct, and other court-ordered sums payable to the state or to the crime victims be paid in full and that cost of collection be borne by the person who is responsible for payment. The Legislature of this state further recognizes that the district attorneys of the various judicial circuits are mandated by law to represent the people of the state, and a strong public policy dictates that restitution, court costs, fines, and other court-ordered sums be enforced within each judicial circuit by the district attorneys in conjunction with the circuit clerks and local courts.

[7]  This court notes that these job descriptions have been provided by DA Marshall in his affidavit.

[8]  The ADA's responsibilities and duties also are defined at § 12-17-184.

3

them with the DA's Office. See Ala. Code § 12-17-220(a).   Investigators also have considerable contact with the public as they serve warrants and pleadings, transport defendants, and investigate possible criminal violations.  The DA trusts and heavily relies on the Investigators to provide him with accurate information to assist the DA in the execution of his duty under Ala. Code § 12-17-184(2) to prosecute criminal violations in district court cases.

According to Marshall, the Victim's Service Officer ("VSO") serves as the "face" of the DA's Office to the victims of crimes in Marshall County and is constantly in contact with the public regarding victims' issues. The VSO corresponds with victims regarding the prosecution of their offenders, assists in collecting restitution for victims, and provides victims with information regarding available community resources. The VSO also insures that the DA's Office complies with the Crime Victim's Bill of Rights. *See* Ala. Code §§ 15-23-60, et seq. (1995).  Although the VSO reports to the Office Manager, the VSO interacts frequently with the DA about the performance of her duties.

During the time period relevant to this case, the Worthless Check Unit Coordinator ("WCUC") assisted the DA in processing worthless checks for prosecution. *See* Ala. Code § 12-17-224 (1995).  The WCUC is responsible for entering new worthless check cases for prosecution, issuing new warrants, and coordinating efforts with investigative staff to locate and arrest defendants. The WCUC regularly attends worthless check hearings and is authorized by the DA's Office to meet with offenders to negotiate and establish payment terms.  The WCUC also responds to inquiries from victims about the repayment of funds used to cover bad checks.

The DA's Child Support Unit Coordinator ("CSUC") works closely with the people who are seeking enforcement of child support obligations, as well as with the ADAs, other attorneys, and

4

Department of Human Resources ("DHR") caseworkers involved in court proceedings.  According to Marshall's affidavit, the CSUC serves as a liaison between the DA's Office and the Department of Human Resources and is the contact person in the DA's Office on child support related matters. She and her staff prepare pleadings and motions for ADAs to sign for enforcement proceedings. The CSUC also responds to inquiries from DHR clients about support payments.

The DA's Office Manager ("OM") serves as a confidential administrative assistant.  The DA allegedly relies on the Office Manager to maintain his trust regarding confidential matters in the office.  The Office Manager, who reports directly to the DA, maintains his personal and professional calendars as well as the employee personnel and payroll records.  The DA regularly uses the OM to answer inquiries on behalf of the DA and to communicate confidential information to other persons.

The remaining persons in the DA's Office, who are not in confidential positions according to Marshall, are employed in the following positions: secretary, receptionist, administrative assistant, student, grand jury clerk, worthless check unit clerk, child support unit clerk, and computer support.

It is undisputed that in June 2001, an incident occurred in ADA Waldrop's office involving physical contact between Dunlap and Waldrop.  While plaintiff alleges that such contact was offensive to her, ADA Waldrop claims an ongoing relationship which involved sexual conversations between him and Dunlap.

Plaintiff described the incident as follows:

> Q: Would you please describe for me what happened on that day in the first week of June, 2001?
> A: Mr. Waldrop called me up to his office to go over a case that I had set on the motion docket. He had the green file. I walked into his office as I normally would. He got up from his desk. He walked around me, behind me, and shut the door. And that immediately alerted me because typically it was never shut, and I heard him lock it. When I turned to look, he had shut the door and locked it, and he was forcing me

back up against the wall. And I asked him what he was doing. He would just say shhh, just shoosh. I said, Byron, what are you doing? Just shhh, just shhh. Ronald is right next door. I said, what are you doing? He had me pinned with my back against the wall. His desk was to the right side of me. He had bookshelves to the left side and he was standing in front of me. He pushed me back against the wall. He put his elbow - I want to say his left arm - his elbow against my chest, and he was trying to put his hand down my shirt to touch my breast. And he had his body weight pushing me up against the wall. That's what was holding me in position. He had his other hand going down my pants below my pelvic bone to the top of my pubic area. His hand was there and I kept saying stop, stop, get off me, stop. Stop it. And the louder I got, he would say shhh. I would say stop it. He was trying to put his mouth on me. I could still feel his hot breath on my neck. I felt like I absolutely was going to die. I couldn't move him because he was so heavy. He kept pushing his hands – he had one hand on my breast underneath the top part of my bra. I could feel his fingers on my nipples. The other hand, again, I could feel he was at the top of my pubic area. And I knew I had to stop him. So I just kept getting louder and louder. That's the only way I knew to get him off of me. So I kept getting louder. I knew Ronald was right next door. And his office is right next to Ronald's. I finally just screamed and shoved past him, unlocked his door and ran down the hallway. I hit the stairwell and just completely lost it. I stood on the top of the stairwell for the longest just squalling. The only thing that I wanted to do is just get back down to my office and lock the door. And I did. I finally got back downstairs and I shut the doors and locked them. Rodney Edmondson was an ADA that was down there. He came in and asked what was the matter. I said, Byron attacked me. And he said, what? And I said nothing, just nothing. I didn't say anything else to anybody that afternoon. It came time to go home and I went home.
Q: And was it part of your job at that time to talk to Byron about cases that he was handling that you were doing the restitution for?
A: Yes, ma'am. He was my assistant DA. He was my DA.
Q: How often would you go to Byron's office before this incident occurred?
A: Anytime to – anytime to discuss a case, and at lunchtime I would go up there. Back before the attack happened, at lunchtime, Byron didn't eat lunch and I didn't eat lunch, Rob didn't eat lunch. We would go up there and sit and hang out until Byron tried to take things further than just friendship, when he started making passes and saying things inappropriate statements, I would say.

According to plaintiff, she told Waldrop repeatedly to get off her, and Waldrop knew the conduct was unwelcome. The morning of the attack, plaintiff stated, she told Steve Guthrie ("Guthrie")(her friend and an Investigator) as well as DA Thompson that Waldrop had physically attacked her. According to plaintiff, Thompson told her that he would handle the situation and for her to stay away

6

from Waldrop. Plaintiff assumed that Thompson would take care of Waldrop and the situation.

Before the attack, plaintiff asserts, Byron's office door always stayed open. According to plaintiff, around 1999, Waldrop had begun to make comments about her breasts and her lingerie, which led her to avoid him and his phone calls. Waldrop reportedly asked plaintiff about her sex life, what type of sanitary products she used, and how far she liked them to "go inside her." Countless times, plaintiff asserts, Waldrop told plaintiff that he wanted to have sex with her. Waldrop asked plaintiff if she liked anal and oral sex and told plaintiff that he could make her feel real good with oral sex. Waldrop allegedly asked her if she liked to have sex doggie style. Waldrop expressed to plaintiff on different occasions that he had an erection. He asked her if she liked to be hurt, since some women liked to be smacked and hit. Waldrop asked her if she ever worried about her job when she was off work.

Plaintiff developed a code word, i.e. "Selma," that she used to warn Investigator Guthrie by two-way radio if Byron was harassing her. According to plaintiff, the harassment became so severe that Guthrie taped together the separation in plaintiff's door so that Waldrop could not stand outside her office and look through the door. Plaintiff alleges that the staff and plaintiff's supervisor, Strickland, were aware of Waldrop's actions and even teased her about it. When plaintiff complained to Strickland, she avers, he told her: "Oh, Donna. You just need to go on and get back to work." Plaintiff sought psychological treatment in October 2002 for stress and anxiety due to the alleged harassment.

Before Marshall assumed the DA position on August 1, 2001, plaintiff alleges, Guthrie advised him of the Byron incident. However, Marshall testified that he "first became aware of it when Bill Strickland called me sometime during the summer of 2001, that Ronald wanted me to be

aware that there was an incident involving Byron and Donna, and if I wanted to pull my name out of the hat as far as seeking the appointment that I could do so." According to plaintiff, neither Thompson nor Marshall remedied the situation, and she is still subjected to a hostile work environment.

Waldrop has never denied the June 2001 incident and even begged for plaintiff's forgiveness. Waldrop was not disciplined by either DA Thompson or DA Marshall.

After the June 2001 incident, defendant alleges, there is no evidence that such physical conduct or sexual-based language occurred again. However, plaintiff testified, after the incident Waldrop "stands over the top of [her]" and "[g]lares at her" in the courtroom. Waldrop has spoken to her on a couple of occasions but only for professional reasons and in a professional manner.

Dunlap filed her EEOC charge on February 27, 2003. According to defendant's calculations, one hundred eighty days prior to February 27, 2003, is September 1, 2002.

On August 1, 2001, when Marshall assumed his office, the DA's Office did not have a policies and procedures manual. Shortly after his appointment, Marshall stated, he established a committee to write such a manual. On February 13, 2002, Marshall disseminated the manual to the employees via intra-office email. Plaintiff received a copy of the email message from DA Marshall and the attached manual. The effective date of the manual was January 1, 2002. No revisions were made or have been made to the manual since that time, and the version of the manual that DA Marshall emailed to employees is the final version.

The manual addressed sexual harassment as follows:

> Sexual harassment of any kind is unacceptable and will not be tolerated. Sexual harassment is defined as unwanted conduct or communications of a sexual nature, which adversely affect the person's employment or working environment. Such

conduct or communication must negatively affect the person's employment, wages, advancement, tenure, and assignment of duties, conditions of employment or working environment. Such conduct is prohibited and employees who violate this policy will be subject to disciplinary action.

The recipient of such behavior must assume responsibility for informing the alleged violator that the conduct is unwelcome. Any employee who wants to report such an incident should promptly contact his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should immediately contact the District Attorney. The facts will be investigated and appropriate discipline, if warranted, will follow.

(Exhibit 6 to Exhibit B, page 3) (emphasis added).

The manual also prescribes a grievance procedure

designed to respond to complaints, views or feelings by an employee that he or she has received insufficient consideration or unfair treatment with regard to employment conditions, relationships between employee and supervisor, or relationships between coworkers, and to provide a process for the prompt, uniform and equitable resolution of such matters.

(*Id.* at page 21.)

Since the implementation of the manual and grievance procedure, defendant alleges, Dunlap has not complained to or even alerted DA Marshall about any of the claims of sexual harassment, hostile work environment, or retaliation contained in her EEOC Charge or her Complaint.[9]

In 2001, plaintiff told both former DA Thompson and current DA Marshall about the June 2001 incident involving Waldrop. According to defendants, both DAs responded to plaintiff's complaint. Thompson instructed her to stay away from Waldrop, and within a month of the incident, Thompson agreed to have all cases that Waldrop handled with the Plaintiff assigned to another ADA. According to DA Marshall's affidavit, he implemented a similar policy when he assumed office, telling Dunlap and Waldrop to not have any contact with each other or to work jointly together.

---

[9] *But see infra*, plaintiff's allegations that Marshall refused to see her or return her calls.

While plaintiff alleges that Marshall promised that she would no longer have to appear in the same courtroom as Waldrop or to see Waldrop at all, Marshall denies this allegation.

According to defendant, Dunlap and Waldrop do not work cases together and have not done so since a month after the June 2001 incident. *See* Dunlap Dep. at p. 100, lines 5-9, and p. 223, lines 5-21.[10]  On motions day, Dunlap and Waldrop may appear in court at the same time.  The Circuit Clerk's Office, not the DA, prepares the docket for Motions Day, which is always held on Fridays twice a month- once in Albertville and once in Guntersville.

Typically, on motions day Dunlap must be in the courtroom for a maximum of two hours.  When motions day is held in Guntersville, ADAs Everett Johnson and Waldrop are in the courtroom together with Dunlap, and on the Albertville motions day, ADAs Ed Kellett and Everett Johnson are in the courtroom together with Dunlap.  In Albertville, Waldrop's cases are heard in a different courtroom by a different judge from the cases in which Dunlap is involved.

Plaintiff seeks assistance from other ADAs (not Waldrop) on motions days.  Although the ADAs attend motions day at the same time as Dunlap, Marshall stated, plaintiff does not work under the direct supervision of any ADA while attending the motions docket.

Since her complaint about Byron's sexual harassment, plaintiff alleges, defendant retaliated against her by decreasing her responsibilities, i.e., she is no longer responsible for depositing money collected by her unit.  Moreover, plaintiff alleges, after the case was filed, Marshall removed all the

---

[10] Specifically, this court notes, plaintiff testified: "*Q: Are you saying y'all have to work on cases together?* A: He may not necessarily work every one of the cases, but he's in the courtroom with me.  He glares at me.  He will come up and sit down beside me in the courtroom at the same time."

Also, plaintiff's affidavit attached to her reply stated: "Contrary to Defendant's assertions which were made to the Court, attached as Exhibits A and B hereto are two docket sheets for the year 2004 reflecting that the Assistant District Attorney, Byron Waldrop, who sexually harassed me continues to be assigned to prosecute cases that are my cases and, therefore, I have to continue to work directly with ADA Waldrop."

employees that had worked downstairs with plaintiff without any explanation.  Plaintiff also avers the following as evidence of retaliation: the camera did not record persons coming to her unit to make payments, her door did not shut properly, and she was left defenseless.  As a result, plaintiff stated, she had no way to get word if Byron showed up except to radio Guthrie and give him the password.

Dunlap's deposition asserts that she lost overtime pay as of 2003.  According to defendant, DA's office employees received a one-time annual payment, known as "overtime pay," over and above their salaries to cover any overtime an employee worked during the year.  Due to recent budget constraints, DA Marshall stated, the DA's Office ceased these payments to all DA employees in 2003.  Defendant points out that plaintiff's salary has actually increased since Marshall assumed office.

In her EEOC charge, plaintiff alleged that Marshall reneged on his promise to pay her emotional therapy charges.  However, Marshall averred, until April 13, 2004, Dunlap had not provided the DA's office with any information regarding the cost of her therapy sessions.  After receiving such information in plaintiff's Responses to Defendant's Request for Production of Documents, defendant issued a April 21, 2004 check to Dunlap for the co-payments for the sessions for which information was produced.  Moreover, Marshall alleged, Dunlap has never been charged any annual or sick leave for these therapy sessions.

According to Marshall's affidavit, plaintiff never had an investigator assigned only to the RRU.  Investigators employed with the DA's Office have always been made available to the RRU and other units to serve warrants.  In the past and at present, Dunlap admits, she had investigators who rotated in serving RRU warrants.

11

Part-time assistants Keisha Rowan ("Rowan"), Aimee Williams ("Williams"), and Anna Marone ("Marone"), were students assigned to each work a one-year term in the RRU with the Plaintiff. Rowan and Williams worked their entire terms in the RRU, while Marone was moved upstairs in Fall 2002 to the main DA's Office after her mother complained to the DA's Office Manager about the nature of Dunlap's conduct around Marone and the way it affected Marone. Plaintiff also had the assistance of part-time investigator Gina Smith ("Smith") during 2002 and 2003. According to Marshall, the DA's Office does not have a surplus of employees to assign to work in the RRU, and due to budget constraints, no additional employees can be hired.

Plaintiff notes that she has not received any disciplinary action while employed by the DA's Office.

## PROCEDURAL HISTORY

On February 27, 2003, plaintiff filed a complaint with the EEOC seeking relief under Title VII for alleged sexual harassment by ADA Waldrop, retaliation by her employer, and a hostile work environment created by having to work with Waldrop.

On December 23, 2003, plaintiff filed a federal lawsuit alleging sexual harassment, retaliation, and hostile work environment under Title VII. Count I alleges that the DA's Office discriminated against Dunlap and subjected her to sexual harassment because of her sex in violation of Title VII. (Id. at ¶ 13.) Count II alleges that the DA's Office has retaliated against her because she complained of alleged sexual advances from ADA Waldrop. (Id. at ¶ 17.) Specifically, Dunlap complains that because of her allegations against the ADA, the DA's Office has forced her to work directly with Waldrop . (Id. at ¶¶ 17, 18.) Finally, Count III alleges that the DA's Office placed Dunlap in a hostile work environment by refusing to investigate her claims against Waldrop and by

requiring her to work directly with Waldrop. (Id. at ¶ 22.)

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving

party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.   DEFENDANT'S MOTION

#### A.   <u>INTRODUCTION</u>

As a RRUC, defendant argues, plaintiff belongs to the DA's "personal staff" and is not an "employee" for Title VII purposes.  Second, defendant contends, the DA's Office is not considered an "employer" under Title VII because it did not employ 15 or more non-exempt persons during 2002 and 2003.  Third, defendant argues, Dunlap's claims of any unlawful conduct occurring before September 1, 2002, are time-barred by the 180-day statute of limitations for Title VII actions, considering the fact that plaintiff filed her EEOC Charge on February 27, 2003.  According to defendant, this time-bar includes Dunlap's claim of sexual harassment by the ADA.  Finally, defendant asserts, Dunlap has not made out prima facie cases of sexual harassment, hostile work environment, or retaliation.

#### B.   <u>PLAINTIFF IS CONSIDERED "PERSONAL STAFF" UNDER TITLE VII AND IS NOT AN "EMPLOYEE" UNDER TITLE VII</u>.

By defendant's account, Dunlap is a member of the DA's "personal staff" and thus is not an "employee" for Title VII purposes. Title VII's definition of "employee" is as follows:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office ....

14

42 U.S.C. § 2000e(f) (emphasis added).

While "personal staff" is not defined by Title VII, defendant argues, the Eleventh Circuit has stated that the term "is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *E.E.O.C. v. Reno*, 758 F.2d 581, 584 (11th Cir. 1985). According to defendant, the determination of Dunlap's status as an "employee" is a question of federal rather than state law, but "[s]tate law is relevant insofar as it describes the Plaintiff's position, including [her] duties and the way [she] is hired, supervised and fired ...." *Calderon v. Martin County, Fla.*, 639 F.2d 271, 273 (5th Cir. 1981).

Defendant cites a number of cases to illustrate the extensive litigation over whether someone is "personal staff." *See, e.g., E.E.O.C. v. Reno*, 758 F.2d 581, 584 (11th Cir. 1985) (Assistant State attorney not an employee under ADEA); *Dubisar-Dewberry v. District Attorney's Office of the Twelfth Judicial Circuit of the State of Alabama*, 927 F. Supp. 1479, 1483-85 (M.D. Ala. 1996) (District Attorney's child support coordinator not an employee); *Americanos v. Carter*, 74 F.3d 138, 143-44 (7th Cir.) (deputy attorney general not an employee under Title VII or ADEA), cert. denied, 517 U.S. 1222 (1996); *Gunaca v. State of Texas*, 65 F.3d 467, 470-72 (5th Cir. 1995) (District Attorney's investigator not an employee under ADEA: `Because the personal staff exception in the ADEA is identical to the personal staff exception found in Title VII, 42 U.S.C. § 2000e(f), courts construe the two exceptions consistently."); *Monce v. City of San Diego*, 895 F.2d 560, 560-61 (9th Cir. 1990) (deputy city attorney was a member of the City Attorney's personal staff); *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996) (deputy sheriff was "personal staff" as a captain, but not as a lieutenant).

Factors to determine whether a plaintiff is considered "personal staff" and thus exempt from

Title VII include: (1) whether the elected official has plenary powers of appointment and removal; (2) whether the person in the position at issue is personally accountable to only that elected official; (3) whether the person in the position at issue represents the elected official in the eyes of the public; (4) whether the elected official exercises a considerable amount of control over the position; (5) the level of the position within the organization's chain of command; and (6) the actual intimacy of the working relationship between the elected official and the person filling the position. *See Gunaca v. State of Tex.*, 65 F.3d 467, 470 (5th Cir. 1995). *See also Teneyuca v. Bexar County, Tex.*, 767 F.2d 148, 151 (5th Cir. 1985); *Laurie v. Alabama Crim. App.*, 88 F. Supp. 2d 1334, 1338 (M.D. Ala. 2000), aff'd, 256 F.3d 1266, 1269 (11th Cir. 2001); *Dubisar-Dewberry at*1483 (M.D. Ala. 1996). "This list is not exhaustive, but it does guide [courts] in looking to the `nature and circumstances of the employment relationship between the complaining individual and the elected official to determine if the exception applies.' " *Gunaca* at 471 (citations omitted). The factors should be narrowly construed. *Id.*.

As in *Gunaca* and *Dubisar-Dewberry*, defendant argues, this case involves an employee appointed by a District Attorney pursuant to a state statute. The *Gunaca* plaintiff, defendant asserts, was an investigator for the county district attorney's office and was not reappointed when a new District Attorney came into office. The plaintiff alleged that the new DA's failure to reappoint the plaintiff violated the ADEA. When the Fifth Circuit evaluated the plaintiff's position as an investigator in light of above-stated six factors, the court affirmed the decision of the trial court to grant the DA's motion for summary judgment, finding that the investigator was a member of the DA's "personal staff." *Id.* at 471-73.

According to defendant, in making a "personal staff" determination, the *Gunaca* court was

16

persuaded by facts similar to those in the instant case.[11] First, defendant notes, the court stated that

the DA had statutory authority to appoint and remove investigators and that the investigators were

statutorily accountable to the DA. *Id* at 471. Moreover, because the investigators performed

functions like making arrests and serving warrants that involved "interaction with the public," the

investigators clearly represented the DA in the eyes of the public. *Id.* The plaintiff in *Gunaca*

satisfied the fourth factor, defendant argues, because the DA controlled the plaintiff's work. *Id.* at

p. 472. Regarding the employee's position within the organization's chain of command, the

*Gunaca* court found that factor less significant in a small office. *Id.* at pp. 472-73.[12] Finally,

plaintiff in *Gunaca* satisfied the sixth factor because he regularly discussed business with the DA,

consulted the DA, and was consulted by the DA regarding work-related matters.

Similarly, defendant argues, *Dubisar-Dewberry* is analogous. In that case, plaintiff was a

child support coordinator in the DA's office of Alabama's Twelfth Judicial Circuit. The plaintiff,

whose position was terminated, alleged pregnancy discrimination because she was pregnant at the

time of her termination. Citing Ala. Code § 12-17-220 (1995), the Middle District found that the

first two factors of the six-factor test were satisfied. This statute "provide[d] the District Attorney

with plenary powers of appointment and removal" and gave the DA sole discretion to hire and fire

personnel, making the plaintiff "personally accountable to [the DA]." Regarding the factor of public

representation, defendant argues, the *Dubisar-Dewberry* plaintiff interviewed people seeking support

---

[11] Although *Gunaca* involved the ADEA, the court stated: "'Because the personal staff exception in the ADEA is identical to the personal staff exemption found in Title VII, 42 U.S.C. § 2000e(f), courts construe the two exceptions consistently.' " *See Gunaca* at 470 (quoting *Montgomery v. Brookshire*, 34 F.3d 291, 294 (5th Cir. 1994)).

[12] The DA's office in that case was considered a "small office" because it had "about fifty-five appointed positions."*Id.* at 472.

and enforcement of child support obligations, discussed child support matters with attorneys, and appeared in court proceedings.  Next, defendant asserts, the court held that the fourth factor of control over the position had been met, considering the DA's authority to determine whether the office would prosecute child support cases.  The court was also persuaded that the position met this factor because the plaintiff served at the pleasure of the DA.

Because the office was a small office (18 employees) having fewer employees than the office in *Gunaca*, the *Dubisar-Dewberry* court concluded that plaintiff's reporting to people in addition to the DA (specifically, the Chief Deputy District Attorney, the Chief Investigator, and the Chief Administrative Assistant) did not foreclose her status as personal staff.  Finally, the Middle District of Alabama found that the sixth factor was satisfied even though the DA and the plaintiff did not have daily contact.  The *Dubisar-Dewberry* court found it sufficient that the DA was routinely advised on matters relating to the child support unit and that he was personally responsible for every unit in the office.  *Id.* at 1486.

Judicial analysis of Ala. Code § 12-17-220(a) (1995) in *Dubisar-Dewberry*, defendant argues, is especially persuasive.  According to defendant, plaintiff's position as RRUC satisfies the first two factors used to define personal staff.  Like all employees in the DA's Office, defendant repeats, plaintiff is at-will and serves at the DA's pleasure.  § 12-17-220(a) provides: "The district attorney of each judicial circuit is hereby authorized to employ, in any manner as he or she shall determine necessary, assistant district attorneys, investigators, clerical, secretarial, and other personnel, who shall be paid from funds available for that purpose." *See also Dubisar-Dewberry* at 1484.

Moreover, defendant contends, the DA has sole discretion to hire and fire employees in the office, thereby making the employees personally accountable to him. *See* Ala. Code § 12-17-220(a)

(1995) ("[A]11 of these employees serve at the pleasure of the district attorney ... ."); Furthermore,

defendant reiterates, DA employees are not part of the State Merit System or any other merit system.

*Id.* ("[A]11 of these employees . .. shall not be considered employees under the State Merit System

Act.")

Furthermore, defendant argues, plaintiff's position with the RRU satisfies the third factor

because she "represents the elected official in the eyes of the public." *See Dubisar-Dewberry*.

Dunlap regularly comes in contact with the public as she collects restitution payments from offenders

and attends courtroom proceedings.  She is authorized to negotiate payment plans with offenders

and/or their attorneys on behalf of the DA for court-ordered restitution and costs,  responds to

inquiries from victims about the court-ordered restitution, and her name has appeared in several

newspaper articles pertaining to her work. *See* Def. Ex. C.  Thus, defendant argues, she clearly

represents the DA's Office in the eyes of the public.

Regarding factor four, defendant urges, the DA exercises a considerable amount of control

over the Plaintiff's position.  While not working directly with the DA, Dunlap performs her work

through the authority of the DA and his office, and the DA is ultimately responsible for the work that

the Plaintiff performs.  In fact, defendant argues, *Dubisar-Dewberry* still found that the plaintiff

coordinator met the fourth factor despite the fact that she reported to a Deputy DA, rather than

directly to the DA.  According to § 12-17-225.2, the DA permits Dunlap's unit to collect payments

or enforce the collection of any unpaid court-ordered monies.

Indisputably, defendant contends, Dunlap performs her duties on behalf of the DA's Office,

*see* Ala. Code § 12-17-225.3 (1995), and the DA or an ADA must sign and authorize any pleading

that Dunlap prepares for cases involving restitution and recovery issues.  As discussed above,

19

defendant argues, the Plaintiff serves at the pleasure of the DA, which *Dubisar-Dewberry* found persuasive when analyzing the fourth factor.

The fifth factor also supports a "personal staff" conclusion, defendant asserts, even though Dunlap reports to the DA through an intermediary. Dunlap's current supervisor, Chief Investigator Marbut, reports directly to the DA. In a small office, defendant argues, the chain of command is not determinative. *See Gunaca* ("In a small office, an employee's placement in the chain of command is less significant to a consideration of the nature and circumstances of the employment relationship between employee and employer").

According to Marshall's affidavit, since 1997 the DA has made as many as 33 appointments in a year (2000) and as few as 21 appointments in a year (2004). In *Gunaca,* defendant notes, 55 appointed staff constituted a small office, and the level of the investigator in the chain of command was deemed to be not very significant. *See Id.* at 472-73. Likewise, defendant argues, in *Dubisar-Dewberry*, an office of 18 appointed employees was considered small, and little significance was placed on the plaintiff's position in the chain of command. Here, defendant argues, its office is small; even at its largest (33), the office still had 22 fewer positions than the office in *Gunaca.*

Finally, defendant contends, the sixth factor is fulfilled, since the DA routinely advised plaintiff, through her supervisor, of matters relating to the administration and management of the RRU. Moreover, defendant asserts, the DA is personally responsible for that unit as well as every unit in the DA's Office.

## C.    THE DA'S OFFICE IS NOT AN "EMPLOYER" UNDER TITLE VII.[13]

---

[13] It does not appear to the court that plaintiff has addressed this argument in her responses to summary judgment.

Title VII of the Civil Rights Act of 1964 applies to any employer with "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." Defendant relies on *Walters v. Metropolitan Education Enterprises, Inc.*, 519 U.S. 202 (1997), in which the Supreme Court found that the "payroll method" was the appropriate method to determine whether an employer has an employee for Title VII jurisdictional purposes. *See Walters* at 207. Under the payroll method, defendant argues, the court examines the existence of an employment relationship on the day in question. Id.

According to defendant, determining the number of individuals on the payroll is only the starting point. After the total number of persons on the payroll have been determined, defendant argues, the EEOC prescribes the following steps to determine the employee count for each week examined in the relevant years: (a) calculate the number of workers who were on the payroll; (b) subtract any workers who were on the payroll, but were not employees; and (c) add any workers who were not on the payroll, but who qualified as employees of the Respondent. *See* Employment Discrim. Coordinator, 125,688, EEOC Enforcement Guidance: Walters v. Metropolitan Educational Enterprises, Inc..[14]

Applying the payroll method to the DA's Office, defendant asserts, the DA's Office has not employed 15 or more "employees" during the relevant years. Dunlap alleges that discriminatory conduct continued until the filing of her complaint on December 23, 2003. Thus, defendant argues, the years to be examined are 2003 and 2002. *See Walters*, 519 U.S. at 207. *See also Komorowski v. Townline Mini-Mart and Restaurant*, 162 F.3d 962, 965-66 (7th Cir. 1998).

---

[14] However, a copy of this EEOC enforcement guidance opinion does not appear to have been provided to the court.

According to the DA's Office, it never employed more than 9 non-exempt employees in any one week in 2003. In 2003, defendant asserts, the highest number of non-exempt employees in a week reached 9, but only during 4 calendar weeks. In 2003, defendant contends, the DA's Office had 27 persons on its payroll, including the DA, and of those 27 people, a minimum of 17 persons served on the DA's personal staff. *See* Def. Ex. 1 to Ex. B. In 2002, Marshall testified, the DA's Office again had 27 persons on its payroll, with at least 17 persons serving as members of personal staff.

Defendant asserts that the following persons on its payroll should be considered "personal staff": the DA, ADAs, Investigators, CSUC, RRUC,[15] WCUC, VSO, and OM. The District Attorney himself is not counted as an employee under Title VII. See 42 U.S.C. § 2000e(f) ("[T]he term `employee' shall not include any person elected to public office.") Likewise, defendant posits, the ADAs are not employees as defined by Title VII because they serve at the pleasure of the DA, represent the DA in court proceedings, and work closely with the DA in the administration of the duties prescribed by Ala. Code § 12-17-184 (1995). *See Teneyuca* at 152 (5th Cir. 1985) (holding that ADA is a member of "personal staff' and is excepted from Title VII's definition of "employee"); *See also E.E.O.C. v. Reno*, 758 F.2d 581, 584-85 (11th Cir. 1985) (holding that an assistant state attorney was not an "employee" within the meaning of ADEA).

Furthermore, defendant asserts, investigators in the DA's Office are also not "employees" as defined by Title VII. They are hired and fired at the DA's sole discretion and are sworn officers carrying a badge that identifies them with the DA's Office. *See* Ala. Code § 12-17-220(a). According to defendant, investigators have considerable contact with the public as they serve warrants and pleadings, transport defendants, and investigate possible criminal violations. Marshall stated that

---

[15] Plaintiff obviously disputes this contention regarding the RRUC as "personal staff."

22

he trusts and heavily relies on the Investigators for accurate information needed to assist the DA in the execution of his statutory duty, i.e., to draw up indictments and to prosecute criminal cases. *See Gunaca* at 470-73 (5th Cir. 1995)(holding that a former investigator for county DA's office belonged to the DA's "personal staff").

Defendant further argues that the CSUC, and other coordinators in the DA's Office, are members of the "personal staff" and thus are not "employee[s]" for Title VII purposes. The DA's Office coordinators perform duties similar to the plaintiff coordinator in *Dubisar-Dewberry*, defendant contends, serving as liaisons between the DA's Office and the public. *See Dubisar-Dewberry* at 1485.

According to defendant, the CSUC works closely with the people who are seeking child support and enforcement of support obligations as well as with ADAs and other attorneys involved in court proceedings.   Similarly, defendant points out, the RRUC and WCUC attend court proceedings and negotiate with offenders and/or defending attorneys on behalf of the DA's Office to establish payment plans for court-ordered restitution and costs.  All coordinators answer inquiries from the public about matters handled by the DA's Office and services provided by their respective units.  The RRUC, defendant argues, assists the DA in the execution of his duties to collect and enforce court-ordered restitution, *see* Ala. Code §§ 12-17-225.1, 12-17-225.3 (1995), while the WCUC assists the DA in the processing of worthless checks for prosecution by the DA's Office, *see* Ala. Code § 12-17-224 (1995).  Furthermore, defendant argues, the DA is routinely advised about matters involving the administration and management of these units and is personally responsible for every unit in the DA's Office.

The VSO, Marshall alleged, represents the "face" of the DA's Office to crime victims in

23

Marshall County and is in constant contact with the public regarding victims' issues. The VSO corresponds with victims regarding the prosecution of their offenders, assists with the collection of restitution for victims, and provides victims information of community resources available to them. The VSO is also responsible for insuring that the DA's Office complies with the Crime Victim's Bill of Rights. *See* Ala. Code §§ 15-23-60, et seq. (1995). Although the VSO reports to the Office Manager, the VSO interacts frequently with the DA regarding the performance of her duties and receives direction from him.

Finally, defendant argues, the DA's Office Manager also belongs to his "personal staff." The DA relies on the office manager to be a confidential administrative assistant who maintains his trust regarding confidential matters in the office. The Office Manager, Marshall stated, reports directly to the DA and maintains his calendars and employee personnel/payroll records. The DA regularly uses his Office Manager to answer inquiries on behalf of the DA and to communicate confidential information to other persons.

Thus, Marshall testified, the only Title VII "employees" in his office include: secretary, receptionist, administrative assistant, student, grand jury clerk, worthless check unit clerk, child support unit clerk, and computer support.

Exempting the DA, ADAs, Investigators, CSUC, RRUC, WCUC, and OM (as "personal staff"), defendant contends, the number of employees for Title VII purposes has never reached 15 in any week in 2002 or 2003.[16] Even if *arguendo* the RRUC, WCUC, and OM are included as "employees," defendant argues, the numbers do not reach 15 in any given week. When performing the additional calculation provided by the EEOC, *see supra*, defendant asserts, the number of

---

[16] Analyses of these years are provided as Exhibits 1 and 2 to Exhibit B to Marshall's affidavit.

"employees" still does not reach 15.  During the relevant years, the DA's Office has only had one person who was on its payroll who did not work in the office: an Investigator in 2002 received compensation from the office for 6 months, but he did not perform work for the office.[17]  Moreover, according to Marshall, no persons worked in the office who were not on the payroll in 2002 and 2003.  Therefore, because the DA's Office did not employ 15 or more employees for each working day in each of twenty or more calendar weeks in 2002 and 2003, defendant asserts, the office does not qualify as an "employer" for Title VII purposes.

### D.   PLAINTIFF'S "FAILURE TO INVESTIGATE" CLAIM FAILS TO STATE A CLAIM UNDER TITLE VII.

According to the DA's Office, Title VII imposes no independent liability for an alleged failure to investigate a claim or complaint of harassment. *See E.E.O.C. v. Total Sys. Servs., Inc.*, 240 F.3d 899, 905 (11th Cir. 2001) (Edmundson, J., concurring).[18]  Thus, defendant argues, DA Marshall had no legal duty to investigate an incident which was alleged to have occurred two months prior to his assuming the position of DA.  According to defendant, the only relevant inquiry is whether acts of harassment continued to occur and did occur within the 180-day period preceding the filing of the Plaintiffs EEOC Charge.  As discussed below, defendant argues, no additional acts of

---

[17] According to defendant, Investigator Dan Smith received compensation from the office's payroll from January 1, 2002 through July 1, 2002.  However, he worked in the county's drug unit, which is separate from the DA's Office.

[18] However, this court notes, *Total System Services* does not appear to stand for so broad a proposition. The cited page of Judge Edmundson's concurrence provided:

> An employee who participates in an employer's own internal investigation of discrimination is within the scope of the opposition clause and can be protected by the clause: for example, an employer cannot throw up just a pretext and get away with punishing an employee for speaking out. But, at the same time, an employer is allowed a bit more freedom in some of its personnel decisions when the employer acts voluntarily to investigate wrongful discrimination and takes the initiative in rooting out discrimination in the workplace: for example, an employee's knowingly false statements are not protected.

harassment occurred after the June 2001 incident.

### E.   ANY DISCRETE ACTS OF DISCRIMINATION THAT OCCURRED BEFORE SEPTEMBER 1, 2002, ARE TIME BARRED.

According to defendant, the discriminatory actions alleged in this case are time-barred. Title VII requires an individual to file a charge with the EEOC "within 180 days after the alleged unlawful employment practice occurred." "A Title VII claimant alleging discrete acts of discrimination ... can pursue only those claims based on discriminatory acts that occurred in the 180-days immediately preceding the filing of a charge of discrimination with the EEOC." *See Lindsey v. Burlington N. Sante Fe Ry. Co.*, 266 F. Supp. 2d 1338, 1343 (N.D. Ala. 2003). Dunlap filed her EEOC charge on February 27, 2003. Therefore, the DA's Office contends, this court should only consider discrete acts that occurred between September 1, 2002, and February 27, 2003.

In the EEOC charge and complaint, plaintiff alleges, she suffered continuous harassment and retaliation, including unlawful conduct that the DA's Office allegedly committed prior to September 1, 2002. Dunlap admits that she has never filed any other EEOC charges against the DA's Office for any other claims.

While a continuing violation tolls the running of the 180-day statute of limitations period, defendant argues, the Eleventh Circuit held that an on-going policy of discrimination that only manifests itself periodically does not continuously injure a plaintiff's rights. *See Thigpen v. Bibb County, Ga., Sheriff's Dept*, 223 F.3d 1231, 1243-44 (11th Cir. 2000).[19] "A claim arising out of an

---

[19] *Thigpen,* this court notes, was abrogated by *Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003) as follows:

> In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court rejected the application of the continuing violation doctrine in hostile work environment cases. *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002). Prior to *Morgan*, we distinguished between the present consequences of a one-time violation and the continuation of the violation into the present to

injury which is 'continuing' merely because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." *See Roberts v. Gadsden Mem'l Hosp.*, 850 F.2d 1549, 1550 (11th Cir. 1988). Thus, defendant repeats, any alleged discrimination that occurred before September 1, 2002, is time-barred.

In her EEOC charge and complaint, plaintiff described the June 2001 harassment incident involving ADA Waldrop. Both documents also list sexual comments that the ADA allegedly made to her and actions that the ADA allegedly did to her or did in her presence.

However, defendant argues, Dunlap has admitted that those sexually-related comments and actions ceased after the June 2001 incident. Dunlap stated that she was not certain when the ADA "quit looking down her shirt or trying to" and does not recall whether it has occurred while DA Marshall has been in office. When asked whether Waldrop has engaged in any of the conduct alleged in the charge and complaint after June 2001, the Plaintiff responded that "he stands over the top of [her]" and "[g]lares at her" in the courtroom but has not touched her or spoken to her in an unprofessional manner.[20]

According to defendant, Waldrop's alleged glares are not mentioned in either her EEOC charge or judicial complaint, and neither has been amended. Furthermore, defendant contends, such

---

determine whether a court could consider acts that occurred before the filing period for the purposes of determining liability. *See, e.g., Thigpen* .... In *Morgan*, however, the Supreme Court simplified the limitations inquiry in hostile work environment cases. The Court instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one "unlawful employment practice," and so long as one act contributing the claim occurs within the filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 122 S. Ct. at 2074.

[20] Specifically, the court notes, plaintiff testified: "*Q: Other than standing near you and breathing on you, is there any other conduct that you've alleged in your charge or complaint that has occurred after the incident in his office?* A: No, ma'am, not that I'm aware of. Not that I can remember off the top of my head." *See* Def. Ex. A at p. 194.

conduct does not amount to actionable conduct under Title VII. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248-49 (11th Cir. 1999).[21]

Also, defendant argues, any hostile work environment claim based on the DA's Office's "refusal to investigate Waldrop," (assuming for the sake of argument that such inaction violates Title VII) is barred. It is undisputed, defendant asserts, that plaintiff informed then-DA Thompson of the Waldrop incident the week that it occurred (in June 2001) and spoke with DA Marshall about the incident shortly after he came into office on August 1, 2001. Thus, defendant argues, Dunlap's failure to file a timely EEOC Charge complaining about the DA's alleged failure to investigate the incident bars any relief for this claim. See *Roberts v. Mem'l Hosp.*, 850 F.2d 1549, 1550 (11th Cir. 1988) ("A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.")

---

[21] The court provides the following excerpt from *Mendoza*:

To the extent Mendoza's testimony about "constant" following and staring established the frequency factor, this evidence does not create a jury issue on Mendoza's sexual-harassment claim. There is no allegation of any staring or following Mendoza outside the workplace or of any calling Mendoza after work. Regarding the workplace, Mendoza admits that Page never followed her in the office part of the plant where Mendoza worked, and thus necessarily spent most of her time. Indeed, Mendoza did not describe the following as walking close behind her in an intimidating or threatening fashion, but instead simply as Page's showing up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside. In her testimony at trial, Mendoza never described Page's following or staring as "stalking" or "leering" or "intimidating" or "threatening." Similarly, none of Mendoza's briefs regarding her Title VII claim before the panel or en banc characterizes Page's following or staring as "stalking," "leering," "intimidating," or "threatening."

Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were "constant" and thus "frequent" under the Harris factors. Also, considering the following and staring described by Mendoza with and in the context of the sniffs, one verbal statement, and one slight touching as Page walked by the fax, we find Mendoza's claim still falls far short of actionable hostile environment sexual harassment.

## F.   PLAINTIFF'S   SEXUAL   HARASSMENT   AND   HOSTILE   WORK   ENVIRONMENT CLAIMS ARE DUE TO BE DISMISSED.

Plaintiff charges the DA's Office with sex discrimination and also claims that the DA's failure to reassign her or to reschedule Waldrop has forced her to work in a hostile work environment because she has to "work directly" with him.  Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." *See* 42 U.S.C. § 2000e-2(a)(1). Sexual harassment can constitute discrimination based on sex for purposes of Title VII. *See Mendoza* at 1244-45." Defendant cites *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000) for a description of the two types of harassment: "Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as `hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as `quid pro quo' harassment)."  The *Johnson* case found that co-worker harassment can only "fall[] into the first . . . class, as co-workers cannot take employment actions against each other."  *Id.*

Defendant argues that it has promptly and appropriately resolved plaintiff's complaint against Waldrop.  According to the DA's Office, employer liability for hostile environment sexual harassment "may turn upon the answers to as many as four questions: (1) What was the alleged harasser's status in the employer's workplace vis-a-vis the victim? (In other words, is the harasser a supervisor or a co-worker?) (2) If the alleged harasser was a supervisor, did an adverse, 'tangible employment action' occur? (3) If the alleged harasser was a supervisor, but the harassment did not culminate in an adverse, 'tangible employment action,' what was the employer's response to the

29

harassment?; and (4) If the alleged harasser was the plaintiff's co-worker, did the employer know of the alleged harassment (either actually or constructively) and take prompt and appropriate remedial action?" *See Tillery v. ATSI, Inc.*, 242 F. Supp. 2d 1051, 1064 (N.D. Ala. 2003).

Here, defendant asserts, the alleged harasser, ADA Waldrop, is not and has never been Dunlap's supervisor but instead is her co-worker. As a co-worker, defendant argues, the ADA had no authority to take any tangible employment action against plaintiff. Defendant highlights plaintiff's admission that she did not know of a time when Waldrop tried to encourage the DA to take any negative action against her. Therefore, defendant contends, because the harasser is not plaintiff's supervisor, the only pertinent question (pursuant to *Tillery*) is the fourth.

In this case, defendant knew of the alleged harassment. Again, defendant states, it took prompt and appropriate remedial action. Both Thompson and Marshall, defendant asserts, responded to the Plaintiff's complaint. DA Thompson instructed her to stay away from Waldrop, and within a month of the incident agreed to have all cases that Waldrop handled with Dunlap assigned to another ADA. When DA Marshall assumed office, he testified, he implemented a similar policy, telling Dunlap and Waldrop neither to have contact nor work any cases together.

By plaintiff's own admission, defendant argues, she and Waldrop do not work cases together and have not done so since a month after the June 2001 incident. While she contends that Marshall promised her that she and ADA Waldrop would not have to appear in the same courtroom together, Marshall denies this allegation.[22] However, defendant asserts, this factual dispute "immaterial"

_____

[22] Additionally, defendant notes, Dunlap claimed that Marshall assured her that she would not be around Waldrop, including at office birthday parties attended by Waldrop and other staff members. According to DA Marshall, the DA is powerless to make such an assurance. The Circuit Clerk, not the DA, is in charge of the court's motion docket.

since plaintiff never complained to DA Marshall that the implemented arrangement was unsatisfactory.[23] Furthermore, defendant contends, Marshall's action was appropriate, since there has been no further sexual harassment by Waldrop.

When management has intervened in a harassment complaint and the victim does not give management any indication that the resolution has allegedly failed, defendant argues, it is reasonable for management to conclude that the resolution was satisfactory and that no further action was necessary on management's part. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999)(stating this in dicta). According to Marshall, he did not learn of Dunlap's unhappiness with the arrangement he had created until her deposition.[24]

---

[23] However, plaintiff appears to dispute the promptness and appropriateness. According to plaintiff's deposition, she complained about going to court with Waldrop and said that she didn't want to go to court with him. Specifically, plaintiff's deposition reads:

> Q: Ms. Dodson asked you whether you had complained about going to court with Byron and you responded yes. When did you complain about going to court with Byron?
> A: To Mr. Marshall when he came down there. I didn't want to be around him. That was the point in getting Rodney to handle my cases.
> Q: Did you specifically say that you didn't want to go to court with him?
> A: Yes, ma'am.

It is unclear to the court exactly when this conversation occurred.

Furthermore, the court notes, Dunlap testified that DA Marshall avoided her when she attempted to speak with him:

> *Q: Have you ever gone to Mr. Marshall and -*
> A: He wouldn't return my phone calls. I have e-mails that I sent to him that he would not respond to. He doesn't talk to me and he hasn't talked to me since the day he came down there in that office with Steve Guthrie and I told him what happened.
> *Q: Have you gone up to his office to make an appointment to go see him to discuss these concerns that you might have?*
> A: I tried. He won't. He doesn't talk to me. If I call, he doesn't answer. I went from my office into Rodney's office and called him and he answered the phone. He told me he would get back with me and I haven't talked to him since. He has Fay Upton contact me for him if it's for anything.

[24] *But see supra* plaintiff's testimony in footnote 23.

31

Defendant emphasizes plaintiff's testimony that the only time she allegedly told DA Marshall that she did not want to be in the same courtroom with Waldrop was in the initial meeting with DA Marshall shortly after he came into office.  According to Dunlap, that meeting occurred between August and December 2001.  After the grievance procedure implemented in January 1, 2002, defendant alleges, Dunlap did not voice her specific concerns about Waldrop appearing in the same courtroom where she is present until the filing of this action.  "A complainant in a discrimination action [does not have] a right to the remedy of her choice."  *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997.)[25]

In assessing whether an employer's response to an harassment complaint is sufficient, the court considers several factors, including the effectiveness of the steps taken (that is, whether it was reasonably likely to prevent the misconduct from recurring), the particular facts of the case, the severity and persistence of the harassment, and the effectiveness of any initial steps.  *See Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1294 (M.D. Ala. 2002.)

Upon learning of the June 2001 incident, defendant asserts, both DAs instructed the parties to stay away from each other, and by assigning all the cases to another ADA, eliminated any direct contact between Dunlap and Waldrop in the performance of their duties.  These steps, defendant observes, resulted in Dunlap no longer needing to go to Waldrop's office for pleadings to be signed or to discuss restitution matters.  Their contact, the DA's Office asserts, was limited to motions day in the courtroom, a public place where other persons are present.  Even on motions day, defendant

---

[25] *But see* footnote 23.

asserts, plaintiff and Waldrop are not working directly together.[26] Defendant concludes that the DA's Office cannot be held liable for its failure to implement the particular remedy now requested by Dunlap.

Moreover, defendant argues, Dunlap has not established a ongoing, hostile work environment for Title VII purposes. The complaint states that Waldrop "has [been] continuously harassed by Waldrop . . . ." In her EEOC Charge and in her Complaint, the Plaintiff alleges actions by ADA Waldrop that occurred before or during the first week of June 2001. Again, defendant points out, Dunlap stated in her deposition that those sexually-related comments and actions ceased after the incident in June 2001. Therefore, defendant argues, the alleged acts of sexual harassment by ADA Waldrop in 2001 are barred by the 180-day statute of limitations as argued *supra*.

To revive her time-barred claims, defendant asserts, plaintiff alleges an on-going sexually hostile working environment. In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the United States Supreme Court held that a hostile work environment, although comprised of a series of separate acts, constitutes a single unlawful employment practice so long as one act contributing to the claim occurs within the filing period. *See also Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003). In so doing, the Eleventh Circuit found, the Supreme Court "redefined the application of statutes of limitations" in hostile working environment cases under Title VII. *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281 (11th Cir. 2002). As the Eleventh Circuit has noted, *Morgan* held that "discrete discriminatory acts [such as termination, failure to promote, denial of transfer, or refusal to hire] are not actionable if time barred, even when they are related to acts

---

[26] Defendant repeats facts that have been detailed earlier in this memorandum opinion. *See supra* at 9-10. Plaintiff contradicts this in her affidavit, quoted *supra*.

alleged in timely filed charges." *Id*. More importantly, defendant argues, the *Morgan* court held that a hostile work environment claim should be reviewed in its entirety so long as one of the events comprising it fell within the statute of limitations and specifically stated:

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1).... It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id*. The *Morgan* court essentially rejected the "continuing violation doctrine" and simplified the law by allowing courts to view allegations of hostile work environment as "a single unlawful employment practice." *Id*. If the smallest portion of that "practice" occurred within the limitations time period, defendant admits then the court should consider it as a whole. *Id*. The Northern District of Georgia recently observed: "As long as that [unlawful employment] practice continues into the 180-day window before a plaintiff files an EEOC charge, the charge is timely." *See McDaniel v. Fulton County Sch. Dist.*, 233 F. Supp. 2d 1364, 1379 (11th Cir. 2002).

The elements of a hostile environment sexual harassment claim under Title VII are as follows: (1) that plaintiff belongs to a protected group; (2) that plaintiff has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [the employee's sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003). However, defendant argues,

Dunlap cannot show that an unwelcome harassing act took place in the limitations period, as any sexual harassment by Waldrop occurred prior to June 2001 and ceased as of the June 2001 incident.

The alleged subsequent "incidents," defendant argues, are neutral events not supporting inference of a continuing, sexually hostile work environment. The claimed "refusal to investigate Waldrop and [its] failure to reassign Plaintiff's or Waldrop's schedule to accommodate her requests to not be required to work directly with Waldrop . . . .", defendant argues, do not show that a sexually hostile work environment still exists at the DA's Office. Instead, defendant contends, all the evidence including Dunlap's testimony demonstrates that any sexually hostile work environment ceased in June 2001. The plaintiff's and Waldrop's continuing to work together regularly since that time, defendant argues, does not constitute an "act" which supports the Plaintiffs claim of an ongoing sexually hostile work environment. Since June 2001, defendant contends that plaintiff has admitted Waldrop has not behaved with unprofessional words or physical conduct.

## G.    THE PLAINTIFF HAS FAILED TO ESTABLISH A CLAIM FOR RETALIATION.

Defendant says that plaintiff's claim that it retaliated against her for her complaints of harassment by Waldrop  have no merit.[27]

---

[27] Specifically Dunlap has stated, she is "required to continue working with Waldrop even after several complaints of his sexual harassment and repeated requests that their schedules be reassigned so she is not required to work directly with Waldrop." *See* Complaint ¶ 17. She further averred that the Defendant's "failure to investigate" and "failure to reassign" were in retaliation for her sexual harassment complaints. *Id.* at ¶ 18. She also complains in the EEOC complaint that the Defendant retaliated against her by not paying for her therapy sessions, by verbally and in writing reprimanding her for missing time for her therapy sessions, by making her bring her sick children to work, by scrutinizing her work, and by removing her full-time investigator and part-time assistant.

Furthermore, plaintiff's deposition stated that Marshall had retaliated against her by taking some of her responsibilities away and assigning them to another employee, Angie Cornett. These changes occurred in February 2004, after the complaint was filed. She also complained that she does not have a key to the new building, while other employees do, and that she has to work in an environment with ladies who harass her. Plaintiff's move to the new building where she works with these ladies occurred in April 2003. According to defendant, Dunlap has neither amended her EEOC Charge nor her complaint to include these allegations. Therefore, defendant argues, Dunlap

A *prima facie* case of Title VII retaliation requires showing "(1) that plaintiff engaged in statutorily protected expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *See Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). Defendant describes the *McDonnell-Douglas* burden-shifting analysis. Defendant's burden to show a legitimate, non-discriminatory reason for the employment action, defendant contends, is "exceedingly light." *See Holifield* at 1564.

Two distinct forms of expression are afforded protection from retaliation under Title VII. Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). These two prohibitions are generally known as the opposition clause and the participation clause, respectively. *See EEOC v. Total Sys. Servs., Inc.* at 1174.

According to defendant, protected expression under the participation clause includes that "which occurs in conjunction with ... the filing of a formal charge with the EEOC." Id. at 1174. In this case, defendant argues, Dunlap has not alleged that an adverse employment action was taken against her subsequent to her filing of a formal charge with the EEOC. Rather, the plaintiff asserts retaliation as a result of her complaints about ADA Waldrop's harassment. Thus, defendant argues, the opposition clause is applicable.

Defendant relies on the following pronouncement in *Total System Services*:

---

cannot *sua sponte* raise them now as new allegations. *See Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279-80 (11th Cir. 2004) ("Allegations of new acts of discrimination are inappropriate.").

> Opposition clause acts . . . are taken outside of the context of a government review and, instead, are taken in the context of the ordinary business environment and involve employers and employees as employers and employees. As in this case, whether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department.

In making this determination, defendant contends, the court is not concerned with whether a particular employment decision was prudent or fair but only with whether it was motivated by unlawful discriminatory animus. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999).

A plaintiff must prove both that she held a subjective belief that the employer's conduct was unlawful and that her belief was objectively reasonable in light of the facts and record presented. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). A plaintiff asserting a claim of retaliation for having opposed unlawful discrimination is not required to prove the underlying claim of discrimination that led to his protected activity, but he "must have had a reasonable, good faith belief that the discrimination existed." *See Holifield* at 1566.

Here, defendant acknowledges, plaintiff certainly engaged in protected activity by complaining to both DAs about the June 2001 Waldrop incident, as internal complaints about sexual harassment constitute protected activity. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001). However, defendant argues, plaintiff cannot satisfy the second prong of her retaliation claim, i.e., that she suffered an adverse employment action. For an employment action to be adverse in nature, the action must either be an "ultimate employment decision," such as termination, failure to promote/hire, or demotion, or meet some threshold level of "substantiality."

*See Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2001). The "substantiality" level is met if the employment action is objectively serious and tangible enough to alter the employee's compensation, terms, conditions, or privileges of employment. An action that has no effect on an employee, defendant argues, does not constitute an "adverse employment action."

Defendant repeats facts detailed earlier in this memorandum opinion regarding plaintiff's court appearances with Waldrop. Moreover, defendant notes, Dunlap's office is located in a separate building from the ADA's and was previously two full floors below the ADA's office.[28] According to defendant, the infrequency of Dunlap's contact with ADA Waldrop is insufficient to alter her employment terms and conditions.

Regarding defendant's alleged failure to pay for her therapy sessions, defendant first argues that it cannot see how that allegation constitutes an employment action. Furthermore, Marshall repeats, until April 13, 2004 plaintiff had not provided him with information regarding the cost of her therapy sessions. On April 21, 2004, upon receipt of this information, the DA's Office issued her a check reimbursing those expenses.[29] Defendant also repeats its position regarding the alleged removal of Dunlap's alleged full-time investigator and part-time assistants. *See supra* pp. 11-12.

Regarding plaintiff's allegation that she was written up and verbally reprimanded for attending her therapy session, defendant argues, she was not charged leave for that time. While plaintiff alleged that she received a written reprimand by then-supervisor John Young for those sessions, defendant points out, no such "reprimand" was placed in her personnel file. Additionally,

---

[28] In her deposition, plaintiff admitted that she had not been in the main DA's Office where ADA Waldrop's office is located in approximately two years.

[29] There does not appear to be any evidence that the defendant had an established practice of paying for therapy sessions.

defendant disputes Dunlap's contention that she was retaliated against by being forced to bring her children to work when they were sick. It is undisputed, defendant argues, that plaintiff underwent a partial hysterectomy in 2002 that required her to be out of work for an extended period of time and exhausted her allotted sick leave. The DA's Office extended to her additional sick leave and continued to pay her salary during her long absence. According to defendant, Dunlap was not asked or required to pay back or work back these extra hours. The fact that she had to bring her kids to work because she lacked sick leave, defendant argues, is not a change in employment conditions and terms sufficient to constitute an adverse action.

Turning to any alleged "undue scrutiny and criticism" of her work and Marshall's alleged statement that Dunlap's "money is dropping," defendant argues, collecting and enforcing restitution payments is Dunlap's job. Defendant argues: "If her money is dropping, it necessarily indicates that she is not performing properly.... To expect the Plaintiff to perform her job is not an adverse action, but an expectation that any employer would have of any employee."

Furthermore, defendant argues, plaintiff has demonstrated no causation between Dunlap's 2001 complaint and these alleged retaliatory actions. *See Pennington v. City of Huntsville, Ala.*, 361 F.3d 1262 (11th Cir. 2001). According to defendant, no evidence contradicts DA Marshall's assertions that any actions taken with respect to the Plaintiff's employment were for legitimate, business reasons, not because of Dunlap's sexual harassment complaint in 2001.

## II.    Plaintiff's Response

### A.    Plaintiff is Not a Member of the District Attorney's Personal Staff.

Plaintiff sets out Title VII's definition of employee as well as the factors examined by the

court when applying the personal staff exception.[30]  Plaintiff agrees with defendant that the personal

staff exception under Title VII is a question of federal law to be construed narrowly.  *See Calderon*

*v. Martin County*, 639 F.2d 271 (5th Cir. 1981).  Dunlap excerpts *Owens v. Rush*, 654 F.2d 1370 (10th

Cir. 1981) regarding the legislative history of the personal staff exception:

> The legislative history of s 2000e(f) indicates that Congress intended that
> the personal staff exception be construed narrowly. The report of the conference
> committee of the House and Senate on this section states in pertinent part:
> It is the intention of the conferees to exempt elected officials and members of their personal
> staffs, and persons appointed by such elected officials as advisors or to policymaking
> positions at the highest levels of the departments or agencies of State or local governments,
> such as cabinet officers, and persons with comparable responsibilities at the local level. It is
> the conferees (sic) intent that this exemption shall be construed narrowly. Also, all
> employees subject to State or local civil service laws are not exempted. (1972) U.S.Code
> Cong. & Ad.News 2180 (emphasis added).
>
> The Senate debate on this section also sheds some light on the intended scope of this
> exception to Title VII coverage. Senator Ervin, the sponsor of the original Senate amendment
> containing the exemption, agreed during the debate that the purpose of the amendment was
> "to exempt from coverage those who are chosen by the Governor, or by the mayor or the
> county supervisor, whatever the elected official is, and who are in a close personal
> relationship and an immediate relationship with him. Those who are his first line advisers."
> 118 Cong.Rec. 4492-93 (1972); *see also Gearhart v. Oregon*, 410 F.Supp. 597, 600- 601
> (D.Or.). Thus it would appear that Congress intended for the personal staff exception to
> apply only to those individuals who are in highly intimate and sensitive positions of
> responsibility on the staff of the elected official.

According to Dunlap, defendant bears the initial burden of demonstrating the applicability

of the personal staff exemption.  *See Oden v. Okibbeha County, Miss.*, 246 F.3d 458, 467 (5th Cir.

2001).  Given the fact-intensive nature of the analysis, Dunlap argues, "summary judgment rarely

is appropriate on this exemption." *See Montgomery v. Brookshire*, 34 F.3d 291, 295 (5th Cir. 1994).

Plaintiff then addresses each factor in turn.

Regarding plenary powers of appointment and removal, plaintiff argues, *Webster's* defines

---

[30] Both have been addressed earlier in this memorandum opinion.

"plenary" as "[c]omplete in all aspects or essentials," while *Black's Law Dictionary* defined is as "power that is broadly construed" or a court's power to dispose of any matter properly before it. Here, plaintiff argues, she was not hired or appointed by Marshall.

As for personal accountability to the elected official, plaintiff argues, she is only personally responsible to her immediate supervisors, Marbut and Upton.[31]  Dunlap relies on the facts of *Gomez v. City of Eagle Pass*, 91 F. Supp. 2d 1000 (W.D. Texas 2000) as "virtually identical."  The *Gomez* plaintiff was a city manager who brought a claim of sex discrimination against the city pursuant to Title VII.[32]  Defendant raised a personal staff defense, but the district court refused to apply the exemption.  The *Gomez* court found that the personal staff exception was confined to "those relationships comprised of an individual serving a single elected official."  While defendant argued that the exception included individuals responsible to the collective members of the city council, Dunlap argues, the court disagreed.  *Gomez* held: "Because the city manager is accountable not to an elected official, but to a collective decision-making body, it is found that she does not fit within the personal staff exception."  According to the *Gomez* court, the personal staff exception is grounded on the need for complete loyalty between elected officials and their closest staff members, "untainted by the threat of litigation."  The court found that a close, personal relationship was "less likely to be found in a situation where a group of persons collectively exert control over a single person."

Furthermore, plaintiff argues, she does not represent the DA in the eyes of the public, as her

---

[31] Again, this court observes, it has not found evidence that Upton was plaintiff's supervisor.

[32] Dunlap argues that as unit coordinator, she has several supervisors, the office manager, investigators, ADAs, and the district attorney.  There is no evidence, Dunlap argues, that she had a close, personal relationship with the DA.

duties consist of logging in payments, filing, issuing warrants, and general clerical duties. While admitting that the is employed by the DA's Office, she alleges that she does not work directly with or on a daily basis with the DA.

Regarding control exercised by the elected official, Dunlap argues, the DA exercises very little control over her daily job duties, which are set by her immediate supervisors. According to Dunlap, it is not a situation where the DA is breathing down her neck and telling her every move to make; instead, Dunlap contends, her "duties are already set in stone and she merely follows those duties." Dunlap emphasizes that her position is administrative and routine, requiring little supervision. By plaintiff's account, her relationship with the DA is different than the relationship between an ADA and the DA. At times, Dunlap confirms, she has not even worked in the same building as the DA.

Turning to her position within the chain of command, plaintiff reiterates that she has two immediate supervisors who control her daily duties and whom she notifies of annual or sick leave.[33] During Dunlap's employment with the DA's Office, she points out, she has had more than five supervisors.

Finally, addressing the factor of the intimacy of the working relationship and the relationship between a particular elected official and the employee, Dunlap alleges that she did not function as the DA's "right hand," have close/daily interaction with him, or have a close exclusive working relationship with him. Dunlap asserts that an insubstantial part of her day (at most) is spent conferring, advising, or assisting the DA. According to plaintiff, as in *Gomez*, it is virtually impossible to conclude that she had an intimate working relationship with the DA when she directly

---

[33] Again, this court is not sure of "two" supervisors.

reports to other supervisors, several investigators, and ADAs. Plaintiff argues that the personal staff exception "is not meant to cover county employees whose only connection to the elected official is that they are county employees." Clearly, Dunlap contends, she does not hold a position of confidentiality. Dunlap highlights defendant's statement: "The remaining positions in the DA's office, who are not in confidential positions, hold the following classifications: secretary, receptionist, administrative assistant, student, grand jury clerk, worthless check unit clerk, child support unit clerk, and computer support." [34] If this court should hold that the personal staff exception applies, Dunlap argues, a bad precedent would be established preventing almost any county or municipal employee from bringing a Title VII action.

### B.   Plaintiff's Title VII Claims Are Ongoing and Therefore Not Time-Barred.

According to plaintiff, Waldrop has continued to sexually harass her. She repeats her allegation that Marshall and Thompson told her she would never have to be in the same courtroom with him or around him period. Plaintiff points out that she is still required to attend motion docket with Waldrop and cites her own testimony: "[He] still to this day stands and breathes over the top of me in the courtroom. All I can think about – it's hard to even work. All I can think about is I want out. I am going to throw up. I sit there and I shake and I think, God, I'm going to fall if I have to stand up." Furthermore, plaintiff alleges, co-workers continue to harass her, joking that would be Waldrop's daughter's stepmother.

In fact, plaintiff argues, Marshall ignored her after her complaints about sexual harassment.

---

[34] The court does not see how this helps plaintiff's position, since as RRUC, she does not appear to hold any of these positions.

While Marshall allegedly specifically told her that he would put something in writing in both her and Waldrop's personnel files, plaintiff alleges, Marshall has refused her telephone calls and ignored her emails. According to plaintiff, Marshall answered her call only when she telephoned him from another office. When plaintiff mentioned Marshall's inaction to Faye Upton, Dunlap alleges, Upton allegedly stated: "I don't know. You know how he is."

**C.   The Actions of Defendant Clearly Create a Cause of Action for Hostile Environment.**

After listing the elements of a sexual harassment claim and the two types of claims, (those that culminate in a "tangible employment action" and those that do not), Dunlap alleges, she can show that she belongs to a protected group, that she was subjected to unwelcome harassment from Waldrop, that Waldrop's harassment occurred because she was a female, and that the harassment was sufficiently severe to alter the terms and conditions of her employment and create a discriminatory working environment. It is undisputed, plaintiff argues, that Dunlap complained about Waldrop's conduct the day after it happened and that Waldrop was not disciplined for his actions. In this case, plaintiff contends, the DA's Office cannot prove that it promptly responded to her complaint or "that the complaining employee has failed to act with reasonable care to take advantage of the employer's safeguards." Plaintiff emphasizes that the DA's Office didn't have a sexual harassment policy.[35]

**III.   Defendant's Reply[36]**

---

[35] It appears Marshall created such a policy in early 2002 and disseminated the policy to DA's Office employees in February 2002.

[36] Defendant moves to strike the plaintiff's response for failure to comply with the submission order requiring plaintiff to "list in a succinct fashion each claim that [she] makes in this case" and to "succinctly list the evidence which purports to create a reasonable inference as to such claim and the source(s) of said evidence."

### A.   Sexual Harassment (Hostile Environment) Claim

Defendant highlights plaintiff's assertions in her response that the "primary incident upon which this action is based occurred in June, 2001" (Waldrop's physical harassment of her) and that prior to June 2001, Waldrop made sexual comments to her.  Defendant does not dispute these allegations.  However, the DA's Office argues, there is no evidence that such conduct occurred again.

Instead, defendant points out, plaintiff complains that subsequent to June 2001 she must appear in the courtroom with Waldrop on motions day and that Waldrop continues to harass her sexually by standing and breathing over the top of her and glaring at her in the courtroom.  However, defendant highlights plaintiff's admission that Waldrop has not touched her and has only spoken to for professional reasons in a professional manner.  Furthermore, defendant alleges, Dunlap and Waldrop have not worked cases together since a month after the June 2001 incident.[37]

According to the DA's Office, by assigning all of the plaintiff's cases to another ADA, defendant eliminated any direct contact between Dunlap and Waldrop in the performance of their duties.[38]  Since June 2001, plaintiff has not needed to go to Waldrop's office for pleadings to be signed or to discuss restitution matters, and their workplace contact has been limited to motions day in a public place -- the courtroom.  Additionally, defendant argues, plaintiff has admitted that since June 2001, she has never been in the courtroom completely alone with Waldrop.  It is undisputed that

---

[37] However, this court notes, Dunlap's affidavit stated: "Contrary to Defendant's assertions which were made to the Court, attached as Exhibits A and B hereto are two docket sheets for the year 2004 reflecting that the Assistant District Attorney, Byron Waldrop, who sexually harassed me continues to be assigned to prosecute cases that are my cases and, therefore, I have to continue to work directly with ADA Waldrop."

[38] *But see, supra,* footnote 37.

the plaintiff and Waldrop only appear in court together one Friday per month for at most two hours at a time.

Relying on *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), defendant argues, such infrequent workplace encounters cannot be said to be "sufficiently severe or pervasive to constitute sexual harassment." Furthermore, defendant contends, ordinary workplace duties and behaviors that are neither gender-related nor sexual in nature are not actionable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) ("The conduct of which plaintiff complains is neither obviously sexual in nature nor even sex-specific.") By defendants' account, the alleged post-June 2001 acts, i.e., the ADA's glaring at her and  standing/breathing near her, are neither sexual in nature nor sex-specific.

While plaintiff's response also listed events such as developing a code word to warn of the ADA's presence, Guthrie's taping together of her office door to inhibit the ADA's view into her office, and teasing by female staff, defendant argues, plaintiff has not listed dates for these events or shown causation with her complaints of harassment. While plaintiff underwent psychological treatment from October 2002 onward, defendant argues, plaintiff's ongoing mental problems do not support an inference of on-going sexual harassment at work.

### B.    Retaliation Claim

Defendant highlights plaintiff's allegations in her response: defendant decreased her responsibilities, specifically removing her responsibility for depositing money collected by her unit; DA Marshall removed all the downstairs employees who worked with Dunlap; the camera did not record persons coming to her unit to make payments; Dunlap's door did not shut properly; and

Dunlap is still required to attend motions docket with Waldrop.[39]  Again, defendant notes, plaintiff

has not provided dates for these alleged actions (thereby warranting defendant's motion to strike

these allegations).

To the extent that the allegations differ in substance from those in the complaint, defendant

argues, they are also not properly before this court.  While Dunlap's responsibilities as RRUC did

change, defendant contends, the change did not occur until February 2004.  According to the DA's

Office, in the absence of an amended complaint, the plaintiff cannot raise such an allegation now.

*See Gregory v. GA Dept. of Human Resources*, 355 F.3d 1277, 1279-80 (11th Cir. 2004)("Allegations

of new acts of discrimination are inappropriate.")[40]

---

[39] The latter allegation regarding motions day has been extensively discussed earlier in this memorandum opinion.  Defendant repeats that the Circuit Court establishes the motion day docket, and defendant must work within those parameters.

[40] The *Gregory* court further stated:

The proper inquiry here therefore is whether Dr. Gregory's complaint was like or related to, or grew out of, the allegations contained in her EEOC charge. Dr. Gregory, without the aid of counsel, filed an EEOC charge after she was terminated. The ultimate act that she complained about was that she was terminated. At the point at which she filed the charge, she "believe[d]" that she was terminated because of her race and sex. She set forth the relevant dates of discrimination in the charge, as well as the reasons why she believed she was terminated. Although not clear in the record, the EEOC presumably investigated, at least in some fashion, the possible reasons why Dr. Gregory was terminated, growing from her initial "belief" that it was because of her race and sex. Indeed, there could be various permutations of non-legitimate reasons why an employee is ultimately terminated. In Dr. Gregory's situation, for example, it could be that race and sex were the only reasons, as she initially believed, why she was terminated. It could also be, however, that Dr. Gregory was terminated in retaliation for having complained about Dr. Fuller's disparate treatment of her, inter alia, during physician scheduling and patient assignments. It could further be that she was terminated for actual legitimate reasons, which is not likely the case here because there is a $10,000 jury verdict in favor of Dr. Gregory suggesting otherwise.

After a careful de novo reading of Dr. Gregory's EEOC charge prepared without the assistance of counsel, and under the liberal EEOC charge strictures of Sanchez, we hold that the district court did not err in finding that Dr. Gregory's retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form. The facts alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination. That is, she stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about was retaliation because of her complaints of Dr. Fuller's disparate treatment to the hospital's administration. Specifically, shortly after being subjected to certain allegedly discriminatory acts, she was terminated. An EEOC investigation of her

Even assuming these claims are properly before the court, defendant argues, the acts do not constitute adverse employment actions sufficient to alter plaintiff's compensation, terms, conditions, or privileges of employment. *See Stavropoulos* at 616-17. Moreover, defendant argues, it has articulated legitimate, non-discriminatory reasons for the actions taken. For instance, DA Marshall testified, Dunlap's RRUC duties changed because of a finding made by the auditors in the State Office of Examiners of Public Accounts, who allegedly insisted that internal audit controls be placed on the handling of funds in the Restitution and Recovery Unit (thereby separating the functions of receiving and depositing funds). According to defendant, plaintiff's assertion that all the employees who worked downstairs with her were removed not only contains no citation to the record but is also inaccurate. In fact, defendant argues, Dunlap was moved from the downstairs of the courthouse in April 2003 to new space in a difference building across the street, where she works with other DA office employees. No evidence suggests the relocation of her unit was not done for legitimate, business reasons, or that plaintiff conveyed to Marshall that she was unhappy in her new location. Regarding the alleged broken door and camera, defendant argues, there is no evidence that Marshall was ever made aware of these things from plaintiff or that anyone else in the office was treated differently than plaintiff with respect to such items. According to defendant, Dunlap has not linked these "facts" to her complaints of sexual harassment.

## IV.    Plaintiff's Reply to Defendant's Reply

---

race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation. See Danner v. Phillips Petroleum Co., 447 F.2d 159, 161-62 (5th Cir.1971) (noting that employee filing an EEOC complaint without the assistance of counsel are to be construed liberally, and holding that EEOC charge complaining of discharge was "reasonably related" to Title VII complaint that "she was discharged").

Plaintiff makes two arguments in her reply. First, Dunlap argues, defendant did not eliminate all direct contact between her and Waldrop.[41]  Second, Dunlap contends, defendant erroneously alleged that plaintiff failed to cite the record in regard to her allegation that after complaining about the sexual harassment, she was left defenseless.[42]  Plaintiff provides the following excerpt from her deposition in this regard:

> Q:   Paragraph twenty-eight: Almost to the end.  What other revenue unit workers have armed security guards?
>
> A:   The check unit.
>
> Q:   Who is that?
>
> A:   The worthless check unit.  They have investigators.
>
> Q:   That's what you mean when you say that?
>
> A:   Right.  At the time this was filed, I was in the office.  When Ronald put me downstairs on the ground floor with the two investigators and was part of the special investigative unit, they had gotten them.  So I wasn't down there completely alone.  When Mr. Marshall came in, he completely emptied that office down there.  I have no idea why anybody left or where they went.  I had a camera that did not record.  I had a door that didn't shut correctly.  I was all by myself, had no way to get any help for anything other than Guthrie, radioing him ad giving him the pass word or the code word if Byron showed up.  But if someone was to show up with a gun or whatever in front of me, there I am.  I'm behind the driver's license, behind the grill.  There's no way out.  One door in and one door out.

## CONCLUSIONS OF THE COURT

There may be a number of reasons why defendant should prevail on its motion for summary

---

[41]  *See supra* quote from Dunlap's affidavit.

[42]  This allegation regarding "being left defenseless," the court notes, appears to derive from Dunlap's February 2003 EEOC charge, paragraph 28, which read:

> The scrutiny and criticism I receive is also retaliation.  I am the only revenue unit worker who does not have armed security guards.  I collect restitution from criminals.  Until I complained about the sexual harassment, I had an armed security guard for protection.  I have now been moved to an isolated area with no security.  The other revenue unit collectors for worthless checks and child support have armed security.

judgment.  Plaintiff's evidence with regard to her sexual harassment, hostile environment and retaliation claims is, however, so insufficient that this court will focus on the merits of those claims.

Considered as discrete acts, it is obvious that the June 2001 and prior thereto acts are time barred.  There is no question that the specific acts of that one June day, as alleged, were horrific.  However, there is no question that action was taken to remedy the situation with Waldrop.  The fact that plaintiff did not file an EEOC charge until at least twenty months later suggests that there was not continuing uncorrected harassment. The fact that plaintiff was exposed to Waldrop on a very limited basis pursuant to court set dockets in a public place does not create a continuing hostile environment.   Plaintiff's evidence more supports an attempt at resurrection rather than continuation.[43]  The alleged harassment here pales in comparison to that in *Mendoza*.  There is no need in this court further comparing the two.

Plaintiff's retaliation claim fails, *inter alia*, because there is no evidence of an adverse action sufficient to maintain such a claim.  Further, there is not a reasonable inference that the matters complained of by plaintiff were caused by any complaint made by her.

While the defendant's "personal staff" arguments as addressed in both I. B and I. C are not frivolous and have apparent merit, the court will not decide those issues.  While the cases provide objective standards, the application of those standards can remain somewhat subjective. It is obvious that the jobs of persons such as plaintiff have a direct impact on the public perception of the D.A.  The fact that she has intermediary supervisor(s) does not eliminate that perception.  If the judgment is appealed, the facts are set out for review where there can be teleiosis.

The defendant's motion for summary judgment will be granted.

---

[43] Some of plaintiff's later frustrations bear little, if any, relationship to Waldrop.

This the 14th day of _____June_____, 2004.

_____
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE